## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

**JONATHAN T. COLE, et al.,**

    **Plaintiffs,**

    **v.**                             **Case No. 5:19-CV-4028-HLT-ADM**

**DUANE GOOSSEN, et al.,**

    **Defendants.**

## MEMORANDUM AND ORDER

Plaintiffs Jonathan Cole, Katie Sullivan, and Nathaniel Faflick filed this case seeking declaratory and injunctive relief regarding certain policies and regulations at the Kansas Statehouse that they claim are unconstitutional. Defendants Duane Goossen, Kansas Secretary of Administration, Tom Day, Legislative Administrative Services ("LAS") Director, and Sherman Jones, Superintendent of the Kansas Highway Patrol—all named in their official capacities—have moved to dismiss the operative amended complaint on grounds that Plaintiffs lack standing. Doc. 22. Plaintiffs have moved for a preliminary injunction. Doc. 3.

Because Plaintiffs face no credible threat of enforcement of the handheld sign provision in the usage policy challenged in Count II of the amended complaint, and because they only face a speculative threat of future alleged retaliation, as claimed in Count IV, the Court dismisses those counts for lack of standing. The Court denies Defendants' motion as to Counts I and III. As to the surviving counts, the Court denies Plaintiffs' motion for a preliminary injunction. The Court finds that Plaintiffs have failed to carry their heightened burden of showing a likelihood of success on the merits for either Count I or Count III and have not demonstrated that they are likely to suffer irreparable harm on either count.

# I.      BACKGROUND

## A.      Plaintiffs' March 27, 2019 Protest

On March 27, 2019, Plaintiffs, along with some others, entered the Kansas Statehouse to protest the failure to expand Medicaid in Kansas. Doc. 9 at 10. During their protest, Plaintiffs unfurled four 24-by-10 feet banners that read "Blood on Their Hands #Expand Medicaid," with each banner naming a different legislative leader. *Id.*[1] Plaintiffs hung the cloth banners from balconies on the 5th floor overlooking the Statehouse rotunda. Tr. at 25:11-12.[2] They held the banners in place using cords strung through the railing balusters. Tr. at 162:15-163:5. The banners hung from the 5th floor down into a walkway on the 3rd floor. *Id.*; Doc. 9 at 10-11.

Within a few minutes, Day removed the banners by pulling them up. Day told Cole, "I am not telling you to leave but don't put the banner down." *Id.* at 10. A short time later, Capitol Police Officer Scott Whitsell stopped Plaintiffs and informed them he was issuing a ban on them entering the Statehouse for one year because they broke policy. *Id.* at 10-11. Whitsell detained Plaintiffs for about ten minutes before releasing them without saying what policy Plaintiffs violated. *Id.* at 11.

The next day, March 28, 2019, Whitsell's supervisor, Lieutenant Eric Hatcher, called Plaintiffs and told them he was lifting their ban from the Statehouse. *Id.* Hatcher told Cole that he

---

[1]    The amended complaint states that Plaintiffs "unfurled four 24 x 10 banners." Doc. 9 at 10. Although the amended complaint does not further describe the banners, it contains several links to news stories about the event, which state that the banners spanned nearly two stories, and which contain video or pictures of the banners showing how large they were. *See* Doc. 9 at 10-11 n.16, n.20 (citing *Students banned from Kansas Statehouse over Medicaid Protest*, KSNT (Mar. 27, 2019), https://www.ksnt.com/news/students-banned-from-kansas-statehouse-over-medicaid-protest/ and Rafael Garcia, *Update: Students no longer banned from Statehouse after unfurling sign with bloody hands for Medicaid expansion*, THE COLLEGIAN (Mar. 27, 2019), https://www.kstatecollegian.com/2019/03/27/students-banned-from-statehouse-after-unfurling-bloody-hand-sign-for-medicaid-expansion/).

[2]    Cites to "Tr. at ___" reference testimony at the hearing held on the motion for a preliminary injunction, available at Doc. 33. Although the Court references facts elicited from the hearing for background purposes, the Court is mindful that it must evaluate the motion to dismiss on the well-pleaded facts of the amended complaint. By contrast, the Court can consider all relevant pleadings and the testimony and evidence presented at the hearing in ruling on the preliminary-injunction motion.

"did something wrong" by unfurling the banners, but that a one-year ban was "a little harsh." *Id.* Hatcher did not identify any specific policy that Plaintiffs violated, but he did tell Cole that he needed to obtain a permit to demonstrate with Sullivan or Faflick in the future. *Id.* Hatcher later testified that he had informed the Capitol Police under his command that bans should only be issued for violations of the law, not policy. Tr. at 262:15-18; 265:5-17; 266:4-13; 283:18-284:5.

### B.     Regulations and Statehouse Policies

After his call with Hatcher on March 28, 2019, Cole reviewed the rules and regulations governing demonstrations at the Statehouse. Doc. 9 at 11-12. According to the amended complaint, Cole discovered that state regulations required prior permission for any "meeting, demonstration or solicitation" on Statehouse grounds, and that a policy prohibited "personal signage" in the Statehouse unless part of a preapproved event. *Id.* Cole also learned that the Capitol Police could ban someone from the Statehouse for any perceived rule violation. *Id.*

Article 49 of the Kansas Department of Administration's regulations govern certain conduct in state-owned buildings. Two are relevant to this case. K.A.R. § 1-49-9 states in part that "[a]ny person violating any of these regulations may be expelled and ejected from any of the buildings or grounds of buildings listed in K.A.R. 1-49-1."[3] K.A.R. § 1-49-10 states in part that "[n]o person shall conduct any meeting, demonstration or solicitation on any of the grounds or in any of the buildings listed in K.A.R. 1-49-1 without the prior permission of the secretary of administration or the secretary's designee."

The Kansas Department of Administration has issued a "Policy for Usage of the Statehouse and Capitol Complex," effective January 2018. Doc. 14-2.[4] The Kansas Statehouse is a historic

---

[3]   K.A.R. § 1-49-1(a)(1) lists the Statehouse as one of the covered properties.

[4]   There is also a separate list of event reminders given to individuals or groups holding events in the Statehouse. *See* Doc. 28-10. Those reminders include some but not all of the rules listed in the usage policy.

landmark and the seat of state government in Kansas. *Id.* at 3. The usage policy states that different entities control different parts of the Statehouse. The Office of Facilities and Property Management ("OFPM"), part of the Department of Administration, controls the ground level and 1st and 2nd floors of the Statehouse, as well as the Statehouse grounds. *Id.* LAS controls the legislative chambers and committee rooms, the 3rd through 5th floors of the Statehouse, and other areas managed by the state legislature. *Id.* The Kansas State Historical Society controls some remaining areas on the ground level of the Statehouse. *Id.*

The usage policy sets out procedures to request permission to hold an "event" in areas controlled by OFPM. *Id.* Non-governmental entities must pay a $20 application fee. *Id.* at 4. Applicants must submit their requests no later than ten work days before the "requested activity." *Id.* at 3. The event must relate to a governmental purpose, and the Secretary of Administration or his or her designee has "final authority in determining whether an event may be approved, whether the event relates to a governmental purpose and whether or not any provision of [the usage] policy may be waived." *Id.* at 3, 5. Those seeking to use space in the areas controlled by LAS must make that request directly to that office. *Id.* at 3. But the usage policy applies to those areas as well. Tr. at 129:3-8. The usage policy also states that "[n]o banners, signs, exhibits or any other materials will be taped, tacked, nailed, hung or otherwise placed in any manner within the Capitol Complex." *Id.* at 7 (section 3.h.xix.). Additionally, the usage policy prohibits "personal signage" in the building. *Id.* (section 3.h.xxii.)

### C.     Kansas Poor People's Campaign June 18, 2018 Incident

The amended complaint also references another incident at the Statehouse a year earlier involving the Kansas Poor People's Campaign. On June 18, 2018, the Capitol Police briefly locked the Statehouse doors to prevent entry by a group of protestors and threatened them with arrest for

unlawful assembly. Doc. 9 at 9. The amended complaint does not allege that Plaintiffs were involved in that incident. In response to the June 18 incident, the Legislative Coordinating Council requested a review of the Capitol Police's conduct. Doc. 9 at 9 n.13 (citing to the report of June 18, 2018 incident); *see also* Doc. 3-2 (report of June 18, 2018 incident). According to the amended complaint, Day, as director of LAS, drafted a report indicating that the Capitol Police have authority to ban or exclude individuals from the Statehouse, and that there were no policies guiding officer discretion on whether or when to exclude or expel individuals from the building. Doc. 9 at 9-10.

### D. Plaintiffs' Lawsuit

Plaintiffs filed this case under 42 U.S.C. § 1983 not long after their March 27, 2019 protest where they unfurled the two-story banners. Doc. 1. Shortly thereafter, they amended their complaint. Doc. 9. The operative amended complaint has four counts. Count I asserts a First Amendment violation against Goossen and Day stemming from the permitting scheme outlined in the usage policy and regulations. *Id*. at 12-13. Count II asserts a First Amendment violation against Goossen and Day based on the usage policy's ban on handheld signs. *Id.* at 14. Count III is against all defendants and asserts First and Fourteenth Amendment violations based on Defendants' policy and practice authorizing the Capitol Police to ban individuals from the Statehouse "if they suspect the individual's First Amendment activity will result in a violation of building rules." *Id.* at 14-15. Count IV asserts a First Amendment retaliation claim against Defendants. *Id.* at 15.

Plaintiffs only seek prospective relief. Specifically, they seek declaratory judgments, a preliminary and permanent injunction enjoining the permitting rules and the ban on all handheld signs, as well as on the policy empowering Capitol Police to ban individuals from the Statehouse.

*Id.* at 16. Plaintiffs also seek an injunction "enjoining Defendants from retaliating against Plaintiffs in the future for past, present, or future exercise of their First Amendment rights." *Id.* at 17.

Upon filing their original complaint, Plaintiffs immediately moved for a preliminary injunction. Doc. 2.[5] They seek a preliminary injunction enjoining Defendants from:

> (1) Enforcing their permitting scheme under K.A.R. 1-49-10 and the Statehouse usage policy;
>
> (2) Enforcing the Statehouse usage policy's ban on the display of hand-held posters and signs in the public areas of the Statehouse and its grounds;
>
> (3) Issuing any complete premises ban pursuant to K.A.R. 1-49-9 that are exclusively for violations of the Statehouse usage policy.

Doc. 3 at 28-29. The Court held an evidentiary hearing on the preliminary-injunction motion on June 19, 2019.[6]

At the same time they responded to the preliminary-injunction motion, Defendants moved to dismiss Plaintiffs' amended complaint for lack of standing. Doc. 22. Defendants' motion challenges Plaintiffs' standing on grounds that they have not demonstrated a particularized, actual, or imminent injury supporting the prospective relief they seek. Doc. 23 at 3. Defendants also briefly argue that, to the extent any claims survive, the Court should dismiss all claims against Defendant Tom Day. *Id.* at 17. Because the motion to dismiss raises the threshold issue of Plaintiffs' standing to assert the claims on which they seek an injunction, the Court first addresses that issue before turning to the motion for a preliminary injunction.

---

[5]   Plaintiffs also sought a temporary restraining order Doc. 11. But before the TRO hearing, the parties informed the Court that they had reached a temporary resolution that allowed Plaintiffs to engage in nondisruptive protests in the Statehouse during the legislative veto session. Plaintiffs then withdrew the motion for a temporary restraining order. Doc. 16.

[6]   On the eve of the hearing, both parties sought leave to file supplemental briefs. Doc. 29, 30. Although neither party has put forth much justification for the additional briefing, the Court grants the motions and has considered the supplemental briefing. *See* Docs. 29-1 and 30-1.

II.     **ANALYSIS**

A.      **Motion to Dismiss**

1.      **At the pleading stage, the Court analyzes standing based on the well-pleaded allegations of the operative complaint.**

Before reaching the question of the preliminary injunction, the Court must first evaluate Plaintiffs' standing to bring this case. *See Initiative & Referendum Inst. v. Walker*, 450 F.3d 1082, 1087 (10th Cir. 2006) ("[W]e cannot reach the merits based on 'hypothetical standing,' any more than we can exercise hypothetical subject matter jurisdiction."). Courts are not "free-wheeling enforcers of the Constitution and laws"—they are limited under Article III of the Constitution to "cases" and "controversies." *Id*. The "mere presence on the statute books of an unconstitutional statute, in the absence of enforcement or credible threat of enforcement, does not entitle anyone to sue, even if they allege an inhibiting effect on constitutionally protected conduct prohibited by the statute." *Mink v. Suthers*, 482 F.3d 1244, 1253 (10th Cir. 2007) (quoting *Winsness v. Yocom*, 433 F.3d 727, 732 (10th Cir. 2006)).

Article III of the Constitution limits the jurisdiction of federal courts to cases and controversies. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). "The case or controversy limitation requires that a plaintiff have standing." *United States v. Colo. Supreme Court*, 87 F.3d 1161, 1164 (10th Cir. 1996); *see also Brady Campaign to Prevent Gun Violence v. Brownback*, 110 F. Supp. 3d 1086, 1091 (D. Kan. 2015) ("One of several doctrines reflecting Article III's case-or-controversy limitation on the judicial power is the doctrine of standing."). Standing requires that a plaintiff have an actual stake in the controversy. *Brady Campaign*, 110 F. Supp. 3d at 1091. A plaintiff can show this stake by demonstrating "that (1) he or she has suffered an injury in fact; (2) there is a causal connection between the injury and the conduct complained of; and (3) it is

likely that the injury will be redressed by a favorable decision." *Ward v. Utah*, 321 F.3d 1263, 1266 (10th Cir. 2003) (quoting *Phelps v. Hamilton*, 122 F.3d 1309, 1326 (10th Cir. 1997)).

The burden of alleging standing is on a plaintiff. *See Initiative & Referendum*, 450 F.3d at 1087. The extent of a plaintiff's burden depends on the stage of the litigation. *Lujan*, 504 U.S. at 561. At the pleading stage, "general factual allegations of injury resulting from the defendant's conduct may suffice," and courts "presum[e] that general allegations embrace those specific facts that are necessary to support the claim." *Id.* (quoting *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 889 (1990)); *see also Initiative & Referendum*, 450 F.3d at 1089 ("When evaluating a plaintiff's standing at this stage, 'both the trial and reviewing courts must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party.'" (quoting *Warth v. Seldin*, 422 U.S. 490, 501 (1975))).[7] But a court need not accept "conclusory allegations, unwarranted inferences, or legal conclusions." *Brady Campaign*, 110 F. Supp. 3d at 1092.

> ### 2. Standing to seek prospective relief based on a claim of First Amendment chilling requires a credible threat of enforcement.

At the outset, the Court notes that Plaintiffs in this case do <u>not</u> seek any retrospective or monetary relief based on the events of March 27-28, 2019. Doc. 9 at 16-17. They do not assert any

---

[7]  Motions to dismiss for lack of jurisdiction under Rule 12(b)(1) can generally take two forms: a facial attack or a factual attack. "[A] facial attack on the complaint's allegations as to subject matter jurisdiction questions the sufficiency of the complaint." *Holt v. United States*, 46 F.3d 1000, 1002 (10th Cir. 1995). A factual attack looks beyond the operative complaint to the facts on which subject-matter depends. *Id.* at 1003. Defendants' motion to dismiss has three exhibits attached: the usage policy, the "Capitol Complex Events Applications," and the relevant Kansas Administrative Regulations. Doc. 23 at 2. Plaintiffs referenced or quoted all these materials in the amended complaint. *See* Doc. 9 at 6 n.1 (citing usage policy); at 6 n.9 (citing Capitol Complex Events Applications); at 7 (outlining and quoting relevant K.A.R. provisions). In response to the motion to dismiss, Plaintiffs include some exhibits for the Court's consideration should the Court construe Defendants' motion as a factual attack and wish to look beyond the pleadings. Doc. 31 at 3 n.1. But in the reply, Defendants clarify their motion is a facial attack of the amended complaint. Doc. 34 at 2. The Court therefore treats this motion as a facial attack and notes that consideration of documents attached to or referenced in a complaint generally do not convert a facial attack to a factual one. *Brokers' Choice of Am., Inc. v. NBC Universal, Inc.*, 861 F.3d 1081, 1103 (10th Cir. 2017).

claims for damages stemming from Defendants' actions in removing the two-story banners Plaintiffs hung from the Statehouse balconies or for the ban that lasted one day. *Id*. Plaintiffs seem to cite that event only to bolster their claim of First Amendment chilling. *See* Doc. 31 at 2 (asserting standing on "their past experience with Defendants and their justifiable fear of future consequences for failing to comply with Statehouse rules"); *see also Winsness*, 433 F.3d at 735 ("We have noted that 'a declaratory judgment is generally prospective relief,' and that we treat declaratory relief as retrospective only 'to the extent that it is intertwined with a claim for monetary damages that requires us to declare whether a past constitutional violation occurred.'" (quoting *PeTA v. Rasmussen*, 298 F.3d 1198, 1202-03 n.2 (10th Cir. 2002))).

As noted above, to demonstrate that he has an actual stake in the controversy, a plaintiff must first demonstrate that he has suffered an injury in fact. *See Ward*, 321 F.3d at 1266. An injury-in-fact is "an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." *Initiative & Referendum*, 450 F.3d at 1087 (quoting *Lujan*, 504 U.S. at 560).

A past wrong in and of itself does not confer standing for prospective relief, absent some "credible threat of future injury." *Mink*, 482 F.3d at 1253 (citing *Los Angeles v. Lyons*, 461 U.S. 95, 108 (1983)). "Absent a sufficient likelihood that he will again be wronged in a similar way," a past wrong against a plaintiff does not entitle him to assert a claim for prospective relief any more so than any other citizen. *Lyons*, 461 U.S. at 111. A suit for prospective relief in a First Amendment case requires a plaintiff to show "a credible threat of prosecution or other consequences flowing from the statute's enforcement." *Initiative & Referendum*, 450 F.3d at 1088 (quoting *D.L.S. v. Utah*, 374 F.3d 971, 975 (10th Cir. 2004)); *Brady Campaign*, 110 F. Supp. 3d at 1092 ("To establish standing for prospective injunctive relief, 'a plaintiff must be suffering a continuing

injury or be under a real and immediate threat of being injured in the future.'" (quoting *Tandy v. City of Wichita*, 380 F.3d 1277, 1283 (10th Cir. 2004))).

The chilling effect of a law can create a judicially cognizable injury. *Initiative & Referendum*, 450 F.3d at 1088. But to qualify, the chilling must arise from an <u>objectively justified fear of consequences</u>; a subjective chill is not enough. *Id*. The Tenth Circuit has explained how a plaintiff seeking prospective relief based on a chilling effect can assert an injury that is sufficiently concrete and particularized for Article III purposes. Specifically, a plaintiff must show:

> (1) evidence that in the past they have engaged in the type of speech affected by the challenged government action; (2) affidavits or testimony stating a present desire, though no specific plans, to engage in such speech; and (3) a plausible claim that they presently have no intention to do so <u>because of</u> a credible threat that the statute will be enforced. Though evidence of past activities obviously cannot be an indispensable element—people have a right to speak for the first time—such evidence lends concreteness and specificity to the plaintiffs' claims, and avoids the danger that Article III requirements be reduced to the formality of mouthing the right words.

*Id.* at 1089 (emphasis in original).

The Supreme Court has also recently held that "the threatened enforcement of a law creates an Article III injury" where a plaintiff alleges "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014) (quoting *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979)).[8]

---

[8] The Tenth Circuit has previously stated that "two types of injuries may confer Article III standing to seek prospective relief" in the First Amendment context. *See Ward*, 321 F.3d at 1267. "First, a plaintiff generally has standing if he or she alleges 'an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by statute, and there exists a credible threat of prosecution thereunder.'" *Id.* (quoting *Phelps*, 122 F.3d at 1326)). The second type of injury is where "a First Amendment plaintiff who faces a credible threat of future prosecution suffers from an 'ongoing injury resulting from the statute's <u>chilling effect</u> on his desire to exercise his First Amendment rights.'" *Id.* (quoting *Wilson v. Stocker*, 819 F.2d 943, 946 (10th Cir. 1987) (emphasis in original)). This encompasses the types of injury claimed in both *Driehaus* (threat of enforcement) and *Initiative & Referendum* (chilling). But the distinction between these injuries is not entirely clear, as both

These cases establish that a plaintiff's First Amendment standing to seek prospective relief turns on a credible threat of enforcement or objectively justified fear of future consequences or prosecution.[9] "When plaintiffs 'do not claim that they have ever been threatened with prosecution, that a prosecution is likely, or even that a prosecution is remotely possible,' they do not allege a dispute susceptible to resolution by a federal court." *Babbitt*, 442 U.S. at 299-300 (quoting *Younger v. Harris*, 401 U.S. 37, 42 (1971)).

In *Driehaus*, the Supreme Court outlined some circumstances that amount to a credible threat of enforcement. *Driehaus*, 573 U.S. at 159-61. Many involved plaintiffs who had engaged in the precise conduct targeted by the law in the past, stated an intent or desire to continue doing so, and the circumstances suggested that the threat of future prosecution was credible. *See, e.g.*, *Steffel v. Thompson*, 415 U.S. 452, 459 (1974) (finding that plaintiff's concern for arrest was not "chimerical" where he had been twice warned to stop handbilling, warned he would be arrested, and his companion had been arrested for the same conduct); *Holder v. Humanitarian Law Project*, 561 U.S. 1, 15-16 (2010) (finding justiciable case or controversy because plaintiffs faced a credible threat of prosecution where they engaged in the targeted action before, would undertake similar action, and the government had prosecuted about 150 individuals for similar conduct and would not disavow prosecution of plaintiffs). The Supreme Court specifically noted that "past

---

ultimately turn on a credible fear of future enforcement or action. The Court notes that in this case, the issue comes down to the same question, and that is whether Plaintiffs face a credible threat of enforcement sufficient to make their claimed injury objectively reasonable, concrete, and imminent, such that it satisfies Article III standing requirements. *See Initiative & Referendum*, 450 F.3d at 1087.

[9]  Administrative consequences can suffice under this standard. In *Driehaus*, the Supreme Court evaluated a law that primarily, or at least initially, led only to administrative action. *Driehaus*, 573 U.S. at 165-66. The Supreme Court noted that "administrative action, like arrest or prosecution, may give rise to harm sufficient to justify pre-enforcement review." *Id.* at 165. In that case, administrative actions could also eventually lead to criminal prosecution, and the Supreme Court concluded "that the combination of those two threats suffices to create an Article III injury under the circumstances of this case." *Id.* at 166. Although the parties do not address the issue, the Court notes that the "ban" at issue here is essentially a trespass warning, which could lead to criminal consequences. *See* Tr. at 259:3-10; 261:20-23.

enforcement against the same conduct is good evidence that the threat of enforcement is not 'chimerical.'" *Driehaus*, 573 U.S. at 164 (quoting *Steffel*, 415 U.S. at 459).

The Tenth Circuit has likewise stated that "evidence of past activities . . . lends concreteness and specificity to the plaintiffs' claims." *Initiative & Referendum*, 450 F.3d at 1089; *see also Wilson*, 819 F.2d at 945-47 (finding appreciable threat of injury flowing directly from statute prohibiting anonymous campaign literature where the plaintiff had been arrested (but not yet charged) for violating the challenged statute and wished to continue his conduct); *Ward*, 321 F.3d at 1266-70 (finding that a plaintiff challenging hate-crimes statute faced a credible threat of prosecution sufficient to confer standing where he had previously been charged under the same statute he was challenging).

By contrast, courts generally find no standing where a plaintiff has never been threatened with enforcement of a statute in the past, or future prosecution has been disavowed in some way. *See D.L.S.*, 374 F.3d at 974 (finding no objectively justifiable "chilling" based on anti-sodomy statute where statute had never been applied to the plaintiff or anyone else similarly situated, where prosecutor said that he would not file charges for the conduct the plaintiff sought to engage in, and similar statutes had been declared unconstitutional by the Supreme Court); *PeTA*, 298 F.3d at 1202-03 (finding no chilling where the challenged statute was initially misinterpreted as applying to the plaintiff's conduct, and thus there was no credible threat of future prosecution); *Faustin v. City & Cty. of Denver*, 268 F.3d 942, 947-49 (10th Cir. 2001) (finding the plaintiff lacked standing to seek prospective injunctive relief because there was no real and immediate threat that she would be prosecuted under the challenged statute in light of prosecutor's determination that her conduct did not violate the statute); *Phelps*, 122 F.3d at 1327 (finding the plaintiffs lacked standing to

challenge a statute that had not been applied against them, despite threats by prosecutor to prosecute the plaintiffs generally and past prosecutions of the plaintiffs under other statutes).

These cases counsel that standing based on a claim of chilling turns on whether there is a credible or objectively justified fear of future enforcement, and that question is largely dependent on whether there has been a past enforcement of the same statue or provision for the same conduct. With this guidance, the Court turns to each of Plaintiffs' claims to evaluate whether they have adequately pleaded sufficient factual allegations to establish standing at this stage of the case. *See Lujan*, 504 U.S. at 561.

### a.     Count I

In Count I, Plaintiffs assert a facial constitutional challenge to various permitting rules for Statehouse events, including that permits are required for any meeting or demonstration regardless of size, that permits must be sought 10 days in advance and cost $20, and that they must have a legislative sponsor and be related to a governmental purpose. Doc. 9 at 13. For relief, Plaintiffs seek an injunction barring implementation of these rules. *Id*. at 16.

Plaintiffs assert they have standing to bring this claim because the "Usage Policy has been applied to restrict Plaintiffs' past protest activity," its terms apply to activity other than just "events," and Hatcher specifically told Plaintiffs they "would need to comply with permit requirements in order to engage in a small group protest in the future." Doc. 31 at 5.

As to the first point—that the usage policy has previously been applied to restrict Plaintiffs' past protest activity—the Court notes that resolution of this issue has been complicated by the somewhat uncompelling comparison Plaintiffs draw between the conduct they engaged in on March 27 (claiming it was just a small five-person[10] protest) with the conduct that they wish to

---

[10]   In addition to the three Plaintiffs, two others were involved in the March 27 protest. Doc. 9 at 10.

engage in in the future (a silent, small-group protest with handheld signs). Doc. 31 at 5-6. Plaintiffs neglect to note that their "small group" protest on March 27 involved them unfurling and hanging several two-story banners from the railings overlooking the Statehouse rotunda—conduct specifically prohibited by a rule that has <u>not</u> been challenged by Plaintiffs. *See* Doc. 14-2 at 7 (3.h.xix., prohibiting the hanging of banners in the Statehouse). This is significantly different than what they claim to want to do in the future, which is stand silently, individually or together in a group of three, with handheld signs. *See* Doc. 31 at 6.

The Court notes that the amended complaint also includes allegations that undercut any claim that any officials specifically enforced the <u>permitting rules</u> of the usage policy against Plaintiffs on March 27. The amended complaint states that no one told Plaintiffs what policy they broke during their March 27 protest. Doc. 9 at 10-11. At the same time, it also alleges that Day told them to not put the banners back down after he removed them, and Hatcher told them the next day that they "did something wrong" by unfurling the banners—suggesting that it was not the permitting rules that were the issue, but the prohibited hanging of two-story banners inside the Statehouse. *See id.*

But the amended complaint does contain one allegation that Hatcher told Plaintiffs that they would have to obtain a permit to engage in future protests. *Id.* at 11.[11] Plaintiffs also point to the plain language of K.A.R. 1-49-10, which states that "[n]o person shall conduct any meeting, demonstration or solicitation [in the Statehouse] without the prior permission of the secretary of

---

[11] Defendants argue that Hatcher's statement on this point must be understood in context, namely that he was speaking to what Plaintiffs must do if they wanted to stage an "event," which was not envisioned to encompass the three-person silent protest Plaintiffs claim to want to do now. *See* Doc. 23 at 9. The Court agrees that a plausible interpretation of Hatcher's statement and the usage policy is that a permit is required to stage a demonstration or "event" on the scale of Plaintiffs' March 27 actions, or some other such "event," but not required for the conduct Plaintiffs claim to want to engage in in the amended complaint (a three-person silent protest). But at this stage of the case, the Court "must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party." *Initiative & Referendum*, 450 F.3d at 1089 (quoting *Warth*, 422 U.S. at 501).

administration or the secretary's designee." This, at least literally read, would apply to Plaintiffs' proposed future activities: to "engage in individual and three-person demonstrations at the Statehouse without prior approval." Doc. 9 at 2. They likewise state, at least cursorily, that the regulations have had a chilling effect and "made Plaintiffs reticent to exercise their First Amendment rights to petition the government during the remainder of the legislative session and at future events taking place at the Statehouse during the Summer and Autumn of 2019." *Id*. at 12.

The Court finds that this <u>narrowly</u> passes the test enunciated in *Initiative & Referendum* for stating an injury based on a chilling effect at the pleading stage. *See Initiative & Referendum*, 450 F.3d at 1089. While the Court agrees that the context of the usage policy and its applications to "events" may ultimately be found to not apply to the activity Plaintiffs want to engage in, the plain language of this regulation does apply to "any" demonstration, and the permitting rules of the usage policy would thus seem to be applicable, at least as judged by the deferential standard at this stage of the litigation. Further, Hatcher's statement could plausibly be read as a threatened enforcement of the permitting rules against a future protest by Plaintiffs, such that they could credibly claim a threat of future enforcement.

In light of this, and because the "general factual allegations of injury resulting from the defendant's conduct may suffice" to show standing, *Lujan*, 504 U.S. at 561, the Court concludes that Hatcher's statement and the plain language of the regulation that requires prior approval for "any" demonstration can generously be read to instill in Plaintiffs a credible threat of future enforcement of the usage policy's permitting rules.[12]

---

[12] The Court notes that this preliminary determination is not finally determinative of this issue, and as the case progresses, so will Plaintiffs' burden. *See Lujan*, 504 U.S. at 561 (noting that "mere allegations" of standing will not be sufficient at summary judgment, and any controverted facts will have to be adequately supported by evidence at trial).

b.      **Count II.**

Count II presents a clearer question. In Count II, Plaintiffs challenge the ban on personal, handheld signs inside the Statehouse. Doc. 9 at 14. But as explained above, no one has ever sanctioned Plaintiffs for having handheld signs in the Statehouse.[13] No one has ever even threatened Plaintiffs with enforcement of the provision of the usage policy that bars personal signs.[14] There is not even any allegation in the amended complaint that Plaintiffs have ever even attempted to bring a handheld sign into the Statehouse. And the amended complaint certainly contains no factual allegations that suggest Plaintiffs have ever faced a credible threat of enforcement of the handheld sign provision—other than a conclusory allegation that enforcement of the sign ban has been "threatened" against Plaintiffs. Doc. 9 at 14.[15] Nor can Plaintiffs claim a credible threat of future enforcement of the handheld-sign prohibition based solely on officials' reaction to them unfurling four two-story banners inside the Statehouse—the conduct is not analogous.

In other words, Plaintiffs are no more chilled from having personal, handheld signs in the Statehouse than any other person. "We have consistently held that a plaintiff raising only a

---

[13]   In response to the motion to dismiss, Plaintiffs attach Whitsell's incident report and claim that it says he told them "they violated Rule 3(h)(xxii) when he banned them from the building"—the provision of the usage policy prohibiting handheld signs. Doc. 31 at 9-10. As noted above, Defendants' motion to dismiss is a facial challenge to the amended complaint, which is proper because the elements of standing are "an indispensable part of the plaintiff's case" and the Court can "presume[e] that general allegations embrace those specific facts that are necessary to support the claim." *Lujan*, 504 U.S. at 561 (1992) (quoting *Nat'l Wildlife Fed'n*, 497 U.S. at 889). Thus, the Court does not look outside the amended complaint to understand the basis of Plaintiffs' claimed injury. But more to the point is that Whitsell's incident report does <u>not</u> cite to any specific provision of the usage policy. It only states that he "told the group that in the Statehouse there are policies/rules about people having protest signs of any kind, especially four-story long banners, hung from the fifth floor, running the full length of the building." Doc. 31-4 at 1. Thus, given the context of Plaintiffs' March 27 conduct, Plaintiffs claim that Whitsell cited them specifically under Rule 3.h.xxii. is somewhat disingenuous to the extent it tries to imply that they were banned from the Statehouse for having handheld signs versus for hanging two-story banners in the rotunda (which is conducted covered by an entirely separate portion of the usage policy—3.h.xix.).

[14]   In support of their preliminary-injunction motion, Plaintiffs curiously argue that "personal signage has consistently been permitted in the Kansas Statehouse Rotunda" and that until the March 27 protest, the policy against handheld signs "was one of non-enforcement." Doc. 20 at 8. Plaintiffs make this argument to try to avoid a heightened standard in establishing the need for a preliminary injunction. *Id*. at 8-9. But it also undercuts their standing

---

16

generally available grievance about government—claiming only harm to his and every citizen's interest in proper application of the Constitution and laws, and seeking relief that no more directly and tangibly benefits him than it does the public at large—does not state an Article III case or controversy." *Lujan*, 504 U.S. at 573-74. Accordingly, Plaintiffs lack standing on Count II.

### c.   Count III

In Count III, Plaintiffs challenge an alleged official policy and practice empowering the Capitol Police to ban individuals from the Statehouse. Doc. 9 at 14-15. They assert that the "unconstitutional overbreadth and vagueness of Defendants' policy, coupled with its chilling effect on First Amendment rights and lack of due process protections, renders the policy facially unconstitutional and invalid in all applications." *Id.* at 15. The provision specifically challenged is K.A.R. § 1-49-9, which empowers Capitol Police to expel or eject from the Statehouse any person violating "any of these regulations." And as noted above, K.A.R. § 1-49-10 states that "[n]o person shall conduct any meeting, demonstration or solicitation" in the Statehouse without prior permission—the provision that Plaintiffs challenge in part in Count I as part of the permitting challenge. *See* Doc. 31 at 11.

For similar reasons to those discussed in Count I, the Court finds that Plaintiffs have standing to seek prospective relief regarding the Capitol Police's authority to issue bans. Officials

---

argument on this claim. If it is true that officials do not enforce the handheld sign ban, that certainly cuts against any credible threat of future enforcement for Article III standing purposes. The Court notes that the motion to dismiss is focused on the well-pleaded allegations of the amended complaint and thus it does not—and need not, for the reasons stated above—rely on this in determining standing. But even if the Court found standing, this would certainly counsel against issuance of a preliminary injunction on Count II. If officials do not routinely enforce the handheld sign ban, then it is unlikely that Plaintiffs face any irreparable harm. Thus, Plaintiffs would not be entitled to a preliminary injunction on this claim.

[15]  In response to the motion to dismiss, Plaintiffs suggest that the provisional agreement between the parties that resolved the need for a temporary restraining order "further supports their allegation of credible fear of enforcement if they silently displayed handheld signs." Doc. 31 at 10. The Court disagrees. The fact that the parties came to an agreement to at least temporarily resolve some of the pressing issues of this lawsuit does not demonstrate that Plaintiffs have a <u>credible</u> threat of future enforcement. Plaintiffs' claim about the handheld sign ban discussed *supra* in note 14 further undercuts this argument.

did ban Plaintiffs in the past (albeit for a very short time), and Plaintiffs have declared an intent to engage in activities in the future that could theoretically subject them to a ban (i.e. protesting in the Statehouse without prior permission). Given the statement by Hatcher that they need a permit to protest in the future, and considering the early stage of the litigation, the Court finds that Plaintiffs have shown at this stage standing to challenge a policy enabling Capitol Police to ban individuals from the Statehouse.

### d.       Count IV

Count IV alleges Defendants retaliated against Plaintiffs for exercising their First Amendment rights, including detaining Plaintiffs for an unreasonable amount of time, imposing a ban on Plaintiffs, and "harassing Plaintiffs through coercive and intimidating investigation tactics because they engaged in speech activity." Doc. 9 at 15. Defendants argue that Plaintiffs only seek prospective relief for this past conduct and that the requested relief will not rectify past retaliation. Doc. 23 at 15-16.

Defendants are correct that Plaintiffs do not seek any retrospective relief for this alleged past retaliation. Plaintiffs only seek "a preliminary and permanent injunction enjoining Defendants from retaliating against Plaintiffs in the future for past, present, or future exercise of their First Amendment rights." Doc. 9 at 17 (emphasis added). The Court agrees with Defendants that this prospective relief cannot rectify the alleged past injury. *Ward*, 321 F.3d at 1266 (stating that an element of standing is that "the injury will be redressed by a favorable decision"). Without redressability on this count, Plaintiffs lack standing.

Plaintiffs counter this by arguing that that Count IV clearly asserts a claim based on "a fear of future retaliation." Doc. 31 at 12. While Plaintiffs may state elsewhere in their amended complaint that they fear future retaliation, Count IV clearly attacks Defendants' past actions in

banning Plaintiffs from the Statehouse on March 27. Doc. 9 at 15 (detailing the alleged retaliatory actions of March 27). Thus, as pleaded, Count IV asserts claims of past retaliation, not a fear of future retaliation.[16]

Nor can past retaliation sustain a claim of future retaliation. "[A] plaintiff cannot maintain standing by asserting an injury based merely on 'subjective apprehensions' that the defendant might act unlawfully." *Finstuen v. Crutcher*, 496 F.3d 1139, 1144 (10th Cir. 2007) (quoting *Lyons*, 461 U.S. at 107 n.8). The Supreme Court has stated that "[p]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects." *Lyons*, 461 U.S. at 102 (quoting *O'Shea v. Littleton*, 414 U.S. 488, 495-96 (1974)).

In *Lyons*, the plaintiff challenged use of chokeholds by police officers because an officer had illegally choked him in a past incident. *Id.* at 105. The Supreme Court held that, although Lyons had standing to claim damages from that past incident, that experience "does nothing to establish a real and immediate threat that he would again be stopped for a traffic violation, or for any other offense, by an officer or officers who would illegally choke him into unconsciousness without any provocation or resistance on his part." *Id.* The Supreme Court went on to note that Lyons would have to allege he <u>would</u> have another encounter with police, that <u>all</u> police choke any

---

[16] The Court also notes that Plaintiffs' allegation of retaliation is largely conclusory in that it simply calls the Capitol Police's conduct retaliatory and states that Defendants' actions "constitute unlawful retaliation for [Plaintiffs'] exercise of First Amendment rights to free expression, peaceable assembly, and petitioning for the redress of grievances." Doc. 9 at 12, 15. A First Amendment retaliation claim requires that a plaintiff show "that (a) he or she was engaged in constitutionally protected activity; (b) the defendant's actions caused the plaintiff to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity; and (c) the defendant's adverse action was substantially motivated as a response to the plaintiff's exercise of constitutionally protected conduct." *Van Deelen v. Johnson*, 497 F.3d 1151, 1155-56 (10th Cir. 2007). Although Plaintiffs have possibly pleaded adequate facts to meet the first two elements, there are no facts suggesting that Defendants banned Plaintiffs <u>because of</u> their exercise of constitutionally protected conduct, rather than for violating certain Statehouse policies, or for other reasons altogether. Having failed to plead sufficient facts to support a claim of past retaliation, Plaintiffs have certainly not pleaded a credible threat of future retaliation.

citizens with whom they have any encounter, and that the city authorized such conduct, in order to establish an actual case or controversy. *Id.* at 105-06.

*Lyons* is instructive here. In this case, Plaintiffs would have had, at a minimum, to allege that they would engage in protected activity and that Defendants would retaliate against them. This seems highly improbable given that the entire premise of Plaintiffs' case is that they desire—but have no immediate plans—to protest in the Statehouse because they fear the consequences. As explained above, Plaintiffs have established standing at this stage to challenge some of those policies in hopes of rectifying that chilling. But they have not established a "real and immediate, not conjectural or hypothetical," *id.* at 102 (internal quotations omitted), threat of future retaliation based solely on their past experience.

Plaintiffs also argue that they have standing because they have shown an ongoing violation by alleging that "enforcement of an unconstitutional law is threatened." Doc. 31 at 12. But this misses the point. Count IV challenges retaliation—not the ongoing enforcement of an allegedly unconstitutional law or regulation. Although Plaintiffs may allege that officials are enforcing the specific provisions of the usage policy or regulations they challenge (the subject of the standing analysis on the prior counts above), that does not establish any ongoing <u>retaliation</u>, which is separate conduct. *See NiGen Biotech, L.L.C. v. Paxton*, 804 F.3d 389, 395 (5th Cir. 2015) ("It is true that a complaint must allege that the defendant <u>is violating</u> federal law, not simply that the defendant has done so." (emphasis in original)). To the contrary, Plaintiffs' amended complaint makes clear that Hatcher lifted the ban—which they claim was retaliatory—just one day after Whitsell imposed it. *See* Doc. 9 at 11. Accordingly, Plaintiffs have even failed to allege any ongoing retaliation that would permit them to seek prospective relief.

Accordingly, the Court finds that Plaintiffs lack standing to assert a claim for prospective relief on their retaliation claim.[17]

### e.      Tom Day

Defendants also very briefly argue that the Court should dismiss Day because none of Plaintiffs' allegations concern conduct by Day or the areas of the Statehouse controlled by LAS, which Day directs. Doc. 23 at 17. But the amended complaint clearly asserts that Day controls the use of the 3rd through 5th floors of the Statehouse—including the area where Plaintiffs staged their March 27 protest, which Day was involved in ending. *See* Doc. 9 at 5, 10; *see also Kitchen v. Herbert*, 755 F.3d 1193, 1201 (10th Cir. 2014) ("Plaintiffs suing public officials can satisfy the causation and redressability requirements of standing by demonstrating 'a meaningful nexus' between the defendant and the asserted injury." (quoting *Bronson v. Swensen*, 500 F.3d 1099, 1111 (10th Cir. 2007))). Further, the usage policy states that individuals seeking to hold events on the 3rd through 5th floor of the Statehouse must make that request to LAS. Doc. 14-2 at 3. This suggests that Day, as director of LAS, holds the final say in who can hold an event on those floors—conduct Plaintiffs wish to engage in. *See Finstuen*, 496 F.3d at 1151 (noting that suit against a state officer with "some connection with the enforcement of the act" is sufficient (quoting *Dairy Mart Convenience Stores, Inc. v. Nickel*, 411 F.3d 36, 372-73 (2d Cir. 2005) and *Ex Parte Young*, 209 U.S. 123, 157 (1908))).

Finally, Defendants contend that Plaintiffs do not indicate that their proposed future activities will happen on those floors controlled by LAS. The Court disagrees. The amended

---

[17]   It does not appear that Plaintiffs' preliminary-injunction motion seeks any relief on Count IV. *See* Doc. 3 at 2 ("This motion, however, is based exclusively on Plaintiffs['] facial constitutional challenges to the Statehouse regulations and usage policy."); *see also id.* at 28-29 (seeking an injunction enjoining Defendants from enforcing the permitting rules, the ban on handheld signs, and from issuing any complete premises bans pursuant to K.A.R. § 1-49-9 that are exclusively for violations of the usage policy). Accordingly, even if Plaintiffs did have standing as to Count IV, there would be no grounds to issue a preliminary injunction as to that count.

complaint simply states that "Plaintiffs seek to engage in individual and three-person demonstrations at the Statehouse without prior approval." Doc. 9 at 2. While Plaintiffs do not indicate specifically a desire to protest on the floors controlled by LAS, neither do they state an affirmative plan to only protest on the other floors. Accordingly, the Court finds that Defendants have not established adequate grounds to dismiss Day at this stage.

In sum, the Court dismisses Count II and Count IV of the amended complaint for lack of standing. The Court will proceed to evaluate Plaintiffs' preliminary-injunction motion on the remaining two claims—Count I involving the permitting rules of the usage policy and Count III involving the Capitol Police's authority to ban individuals from the Statehouse.

### B.     Motion for Preliminary Injunction

#### 1.     Plaintiffs' request for a preliminary injunction alters the status quo and thus the Court applies a heightened standard.

Having determined that at least some of Plaintiffs' claims survive the initial motion to dismiss, the Court now turns to Plaintiffs' motion for a preliminary injunction, but only as to the surviving claims. The Court denies the motion as to the dismissed claims.

A party seeking a preliminary injunction must show "(1) he is likely to succeed on the merits of his claim; (2) he will suffer irreparable harm if the injunction is denied; (3) his threatened injury outweighs the harm the grant of the injunction will cause the opposing party; and (4) if issued, the injunction will not adversely affect the public interest." *McDonnell v. City & Cty. of Denver*, 878 F.3d 1247, 1252 (10th Cir. 2018). A preliminary injunction is "an extraordinary remedy" that requires a "clear showing" of an entitlement to relief. *Id*. (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)).

Courts disfavor three types of preliminary injunctions: (1) those that alter the status quo; (2) mandatory preliminary injunctions; and (3) preliminary injunctions that afford all the relief that

could be awarded after a full trial on the merits. *O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 977 (10th Cir. 2004) (en banc). A movant seeking these types of injunctions must satisfy a heightened burden. *Id*. Specifically, the movant has a heightened burden as to both the likelihood-of-success prong and on the balance of the harms. *McDonnell*, 878 F.3d at 1252.

Plaintiffs suggest they not have to meet this heightened burden because "Plaintiffs simply seek to be able to assemble in small groups without prior approval and display handheld signs inside the Statehouse." Doc. 20 at 7. But that does not address whether they are seeking to change the status quo.[18] Plaintiffs are seeking to stop enforcement of certain regulations and policies currently in place—to effectively order the state to change its current Statehouse policies. This would clearly alter the status quo. Accordingly, Plaintiffs have a heightened burden.

        **2.**       **Plaintiffs have not met their heightened burden of likelihood of success on the merits.**

        **a.**       **Count I**

Whether Plaintiffs have a likelihood of success on the merits of Count I first relates back to the standing analysis above. The Court has already concluded that Plaintiffs' standing to challenge the permitting policies is thin, even given this early stage of the case where it considers only the factual allegations in the amended complaint. As explained above, Plaintiffs' past conduct is very different than their proposed conduct. The premise of their case is that, as a result of them unfurling several two-story banners, they fear enforcement of permitting policies. Although the Court has found that, by a narrow margin at this very early stage, Plaintiffs have pleaded adequate

---

[18]   To the extent Plaintiffs claim that their requested injunction would not alter the status quo because the personal sign ban is not currently enforced, *see supra* note 14, that argument is no longer relevant given the Court's finding that the Plaintiffs lack standing to challenge the personal sign ban. They make no such similar arguments to the policies underlying the surviving counts.

facts to overcome an initial standing inquiry, the Court is less convinced that they will be able to muster sufficient evidence to maintain their standing under the analysis above as their burden increases with the progress of this litigation. *See Lujan*, 504 U.S. at 561. Accordingly, the Court doubts Plaintiffs' likelihood of success because they very likely will be unable to sustain a more rigorous standing challenge.

Even if Plaintiffs have standing to pursue Count I, the Court finds that Plaintiffs have failed to carry their burden on the substantive analysis. A first step in evaluating a request for a preliminary injunction is evaluating whether the Plaintiffs have demonstrated a likelihood of success on the merits of their claim. *McDonnell*, 878 F.3d at 1252. As noted above, Plaintiffs' have a heightened burden on this element. *Id.* In evaluating the likelihood of Plaintiffs' success, "[t]he proper framework to apply in a facial challenge is . . . to apply the appropriate constitutional test to determine whether the challenged restriction is invalid on its face (and thus incapable of any valid application)." *Doe v. City of Albuquerque*, 667 F.3d 1111, 1122 (2012). This does not require a showing that there are no set of circumstances that the law could constitutionally apply. *Id.* at 1124. Rather, it just measures the terms of the statute against the applicable constitutional standard. *Id.* at 1127.

The First Amendment of the United States Constitution provides that "Congress shall make no law . . . abridging the freedom of speech." U.S. CONST. amend. I. But an individual's right to free speech is not absolute and "[e]ven protected speech is not equally permissible in all places and at all times." *Snyder v. Phelps*, 562 U.S. 443, 456 (2011). Courts employ a three-step process to analyze free speech claims: (1) determine whether the plaintiff's conduct is protected speech; (2) "identify the nature of the forum, because the extent to which the [defendant] may limit access depends on whether the forum is public or nonpublic"; and (3) determine "whether the

justifications for exclusion from the relevant forum satisfy the requisite standard." *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 797 (1985).

The parties do not dispute that this case involves constitutionally protected speech. Thus, the key step in the First Amendment merits analysis is determining the nature of the forum involved, because "[t]he existence of a right of access to public property and the standard by which limitations upon such a right must be evaluated differ depending on the character of the property at issue." *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 44 (1983). Four types of fora may exist on government property: (1) traditional public fora; (2) designated public fora; (3) limited public fora; and (4) nonpublic fora. *See Doe*, 667 F.3d at 1128. As discussed below, restrictions in the first two forums face a more exacting scrutiny, while those in the latter two require a less rigorous justification.

Plaintiffs primarily argue that the Statehouse is a traditional public forum. Doc. 3 at 10-14. The Court disagrees. Traditional public forums are those such as "streets and parks which have immemorially been held in trust for the use of the public and . . . have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." *Doe*, 667 F.3d at 1128 (quoting *Perry*, 450 U.S. at 45-46); *Celebrity Attractions, Inc. v. Oklahoma City Public Prop. Auth.*, 660 F. App'x 600, 604 (10th Cir. 2016) (stating that traditional public forums "are places like streets and parks, which 'by long tradition have been open to public assembly and debate'" (quoting *Verlo v. Martinez*, 820 F.3d 1113, 1129 (10th Cir. 2016))). While the Court acknowledges that the Statehouse is generally a place where debate and the exchange of ideas occurs by elected officials, the Court sees no similarity between the Statehouse rotunda—where elected officials have offices and which houses important historical artifacts—and a sidewalk or public park. To hold that the Statehouse rotunda—in close proximity to the offices of the governor

and legislators and other state officials—is a traditional public forum would open up the very center of the Statehouse to the same activities that can take place on a city street or public park. The Statehouse rotunda simply is not appropriate for such conduct, and Plaintiffs have not come forward any evidence to the contrary.

Some cases cited by Plaintiffs generally assert that statehouses are traditional public forums. But in reality, those cases focus on the grounds <u>outside</u> a statehouse. S*ee Harcz v. Boucher*, 763 F. App'x 536, 542 (6th Cir. 2019) ("Here, the parties agree that the appellants engaged in protected speech and that the Michigan State Capitol grounds constitute a public forum."); *Watters v. Otter*, 986 F. Supp. 2d 1162, 1170, 1173 (D. Id. 2013) (focusing on the outside grounds surrounding the statehouse); *Pouillon v. City of Owosso*, 206 F.3d 711, 715 (6th Cir. 2000) (focusing on the steps of city hall). Those cases support the notion that the grounds surrounding the Statehouse—greenspace, sidewalks, and a park-like setting—may qualify as a traditional public forum. But the Court need not decide that issue here. This is because Plaintiff Cole testified that he only wishes to protest in the Statehouse rotunda. Tr. at 33:1-3 ("Q. And can you be specific about where you plan to do your protest at the Statehouse? A. Particularly in the rotunda."). Plaintiffs Sullivan and Faflick did not testify at the hearing. All three Plaintiffs filed generally identical affidavits in support of the preliminary-injunction motion. *See* Docs. 3-3, 3-4, and 3-5. All state a generic desire to protest either "in" the Statehouse or "at" the Statehouse. But none specifically discuss protests on the sidewalks or around the Statehouse grounds. Accordingly, the Court concludes that the Statehouse grounds, or any other areas beyond the Statehouse rotunda, are not at issue for purposes of the preliminary-injunction motion.[19]

---

[19]   Stated differently, because Plaintiffs express no desire to protest on the Statehouse grounds or anywhere other than the Statehouse rotunda, they suffer no irreparable harm from the lack of a preliminary injunction as to those forums.

The Court also disagrees with Plaintiffs that other courts have "unambiguously" held that statehouses are traditional public forums. Doc. 3 at 11. The cases cited do not support Plaintiffs' claim. For example, in *Chadbad-Lubavitch v. Miller*, the court did, as Plaintiffs quote, state that the statehouse rotunda in Georgia was "a true public forum [that] fundamentally defines the constitutional analysis." 5 F.3d 1383, 1392 (11th Cir. 1993). But that was in the context of determining whether the state would violate the Establishment Clause by allowing a particular religious display. *Id.* At the same time, the court noted that the parties did not dispute the lower court's finding that the statehouse rotunda at issue was a limited public forum, *id.* at 1391, while later stating that the rotunda would more precisely be described as a "designated public forum," *id.* at 1391 n.13. This is not "unambiguous."

Plaintiffs alternatively argue that the Statehouse rotunda is a designated public forum. "[G]overnmental entities create designated public forums when 'government property that has not traditionally been regarded as a public forum is intentionally opened up for that purpose[.]'" *Christian Legal Soc'y Chapter of the Univ. of Cal., Hastings Coll. of Law v. Martinez*, 561 U.S. 661, 679 n.11 (2010) (quoting *Pleasant Grove City v. Summum*, 555 U.S. 460, 469 (2009)). However, the "government does not create a public forum by inaction or by permitting limited discourse, but only by intentionally opening a nontraditional forum for public discourse." *Cornelius*, 473 U.S. at 802.

In support of their claim that the "Statehouse bears the indicia of a designated public forum," Plaintiffs cite to past rallies and protests held there. *See* Doc. 3 at 12 nn. 20-21. But the examples cited occurred <u>outside</u> the Statehouse, which tells the Court little about the nature of the Statehouse rotunda as a forum. Nor is the Court persuaded by Plaintiffs' argument that the Statehouse rotunda is a public forum simply because it is "large, open, and encompass[es] spaces

dedicated to pedestrian passage," that the space is "physically compatible with expressive activity," and that the rotunda is open to the public. Doc. 3 at 12-13. The same is true for many buildings, public or not. That does not make them the equivalent of a public sidewalk or street for First Amendment purposes. Finally, and perhaps most significant, is the fact that there is no indication that the state has intentionally opened the Statehouse rotunda for unlimited public discourse. That is evidenced by the very reason Plaintiffs bring this case—the permitting rules. Those rules set specific limitations on what type of events and on what terms can occur in the Statehouse. "[P]ermitting limited discourse," *Cornelius*, 473 U.S. at 802, is not an indication that officials wish the rotunda to be the equivalent of a sidewalk or public park. The Court therefore finds that Plaintiffs have not met their burden to show that the Statehouse rotunda is either a traditional or designated public forum. Because these forums carry a higher degree of scrutiny, *see Christian Legal Soc'y*, 561 U.S. at 679 n.11; *Doe*, 667 F.3d at 1130-31, Plaintiffs are unlikely to succeed on their claims if the forum is not either a traditional or designated public forum.

In their reply brief, Plaintiffs contend that they still are likely to succeed even if the Statehouse rotunda is a limited public forum.[20] In a limited public forum, courts employ a more relaxed standard to evaluate the regulations at issue. It "may reserve the forum for its intended purposes, communicative or otherwise, as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view." *Perry*, 460 U.S. at 46; *see also Christian Legal Soc'y*, 561 U.S. at 679 n.11 (stating that in a limited public forum, "a governmental entity may impose restrictions on speech that are reasonable and viewpoint-neutral"); *Farnsworth v. City of Mulvane*, 660 F. Supp. 2d 1217 1224-25 (D. Kan. 2009) ("Both the Supreme Court and the Tenth Circuit have applied nonpublic fora standards to 'limited

---

[20]   Neither party has argued that the Statehouse rotunda is a nonpublic forum.

public fora' such that restrictions on speech must be reasonable and viewpoint-neutral."). In other words, in a limited public forum, the government can put reasonable limits on content based on the nature of the forum, so long as the distinctions are viewpoint neutral. *Summum v. Callaghan*, 130 F.3d 906, 916 (10th Cir. 1997).

Plaintiffs argue that the fact that the usage policy vests discretion to approve or deny a permit request or waive any requirements renders the permitting scheme invalid, even if the Statehouse rotunda is a limited public forum. Doc. 3 at 18; Doc. 20 at 13-15.[21] The Court notes Plaintiffs' contention that the cases from outside the Tenth Circuit suggest that the discretion allowed to OFPM and LAS to deny permit requests for events in the rotunda creates a sufficient presumption of viewpoint discrimination, such to the extent that any such discretion even in a limited public forum is unconstitutional.

Although the "Supreme Court has not incorporated the rule against unbridled discretion into the requirement of viewpoint neutrality," the Court agrees with the parties that some circuits have. *Amidon v. Student Ass'n of the State Univ. of N.Y. at Albany*, 508 F.3d 94, 103 (2d Cir. 2007); *see also Child Evangelism Fellowship of Md., Inc. v. Montgomery Cty. Pub. Sch.*, 457 F.3d 376, 387 (4th Cir. 2006) ("For this reason, even in cases involving nonpublic or limited public forums, a policy (like the one at issue here) that permits officials to deny access for any reason, or that does not provide sufficient criteria to prevent viewpoint discrimination, generally will not survive constitutional scrutiny."); *Kaahumanu v. Hawaii*, 682 F.3d 789, 807 (9th Cir. 2012) ("[B]ecause the potential for the exercise of such power exists, we hold that this discretionary

---

[21] Plaintiffs also claim the lack of exception in the permitting rules for small groups or individuals is unconstitutional, but that analysis is based on the presumption that the Statehouse rotunda is a traditional or designated public forum. Doc. 3 at 14-17 (arguing that the permitting rules "lacks narrow tailoring" because it does not have a small-group exception). But the Court has concluded that Plaintiffs have not shown that the Statehouse rotunda is a designated public forum, and thus that standard does not apply. Plaintiffs have not analyzed this feature of the policy under the reasonableness standard that applies if the Statehouse rotunda is a limited public forum.

power is inconsistent with the First Amendment."). The primary Tenth Circuit authority cited by either party on this issue is *Summum v. Callaghan*.

In *Summon*, a church wished to display a monument with its own religious tenets next to a monument of the Ten Commandments on a county courthouse lawn. *Summon*, 130 F.3d at 910. When the county denied the request, the church sued. *Id.* Although the court noted that "unbridled discretion" often "raises the specter of . . . viewpoint discrimination, *id*. at 919 (quoting *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 763 (1988)), it did not hold that such discretion is a de facto unconstitutional provision. In *Summon*, the body with discretionary authority had denied the plaintiff's request to place a monument in an area where another monument with a different viewpoint already existed. *Id.* at 910. The court noted shifting explanations as to why. *Id.* at 919-20. On remand, the court ordered a careful examination as to why the county denied the request, given that the discretion of the deciding authority made viewpoint discrimination a dangerous possibility. *Id.* at 920.

Although *Summon* expressed concern about the possible negative effects of unfettered discretion of decisionmakers, the Court notes that the Tenth Circuit did not hold that discretion in and of itself equaled a constitutional violation.[22] Indeed, it remanded for an evaluation of why the county denied the request. *See id.* Based on this, the Court finds that Plaintiffs have not established that the discretion afforded Day and Burnham automatically renders the permitting scheme unconstitutional.

Accordingly, the Court finds that Plaintiffs have not established a likelihood of success on the merits because they have not demonstrated that the Statehouse rotunda is a traditional or

---

[22] Even the Fourth Circuit, which has held that "boundless discretion over access to the forum violates the First Amendment," *Child Evangelism Fellowship*, 457 F.3d at 386, has stated that review of a grant of discretion cannot be a static inquiry. *Id.* at 387.

designated public forum, and thus they have not established that a heightened scrutiny applies. Further, they have likewise not persuaded the Court that they are likely to succeed if the Statehouse rotunda is a limited public forum.

### b. Count III

Much like with Count I, the Court has serious doubts of Plaintiffs' likelihood of success on the merits of Count III because of the problems Plaintiffs face with standing. Because Plaintiffs' fear of another ban stems from their fear that officials will enforce the permitting policies against their proposed activity—which is very different from their past activity—the Court questions their fear of future enforcement. *See Initiative & Referendum*, 450 F.3d at 1089 (noting that standing turns on a "credible threat" of enforcement). This counsels against a finding of a likelihood of success on the merits for Plaintiffs' challenge to the Capitol Police's authority to ban individuals from the Statehouse.

Substantively, the Court notes that Plaintiffs are not challenging the reasonableness of their ban, or any particular ban. They are challenging the facial constitutionality of K.A.R. § 1-49-9, which states that "[a]ny person violating any of these regulations may be expelled and ejected" from the Statehouse. *See* Doc. 20 at 17-18. Notably, on its face, K.A.R. § 1-49-9 does not even implicate First Amendment conduct. *See Cornelius*, 473 U.S. at 797 (stating that the first step in analyzing a free-speech claim is determining whether the conduct is protected speech). Plaintiffs do briefly argue that the Capitol Police have "maintained a practice of banning individuals from the Statehouse for future violations they predict will occur as a result of their First Amendment activity." Doc. 3 at 24. But this is a largely conclusory statement, and it does not establish a likelihood of success on the merits. *Lyons*, 461 U.S. at 103 ("Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied

by any continuing, present adverse effects." (quoting *O'Shea*, 414 U.S at 495-96)). Nor is it clear that two isolated incidents establish a policy or practice.

Plaintiffs also argue that K.A.R. § 1-49-9 is unconstitutional for the same reason the permitting policy is unconstitutional—because it allows police officers discretion in deciding who to ban. Doc. 20 at 18-19. But the Court has already concluded that Plaintiffs have not established that discretion in and of itself renders a provision unconstitutional. *See supra* section II.B.2.a. Further, at least one case relied on by Plaintiffs actually cuts against their argument that K.A.R. § 1-49-9 is unconstitutional <u>because</u> it affords Capitol Police discretion. *See Yeakle v. City of Portland*, 322 F. Supp. 2d 1119, 1127 (D. Or. 2004) (concluding that a provision requiring a "one-size-fits-all thirty-day exclusion irrespective of the nature of the violation" fails narrow tailoring).

Several of the cases relied on by Plaintiffs discuss specific bans against specific individuals, and the issue in the case was whether that particular ban was constitutional. *See, e.g. Barna v. Bd. of Sch. Dist.*, 143 F. Supp. 3d 205, 222-23 (M.D. Pa. 2015), *aff'd in part, vacated in part* 877 F.3d 136 (3d Cir. 2017) (discussing the constitutionality of "the imposition on an individual, such as Barna herein, of a ban on attendance and speech at meetings of a school board, city council, or other limited public fora"); *Doe*, 667 F.3d at 1134 (discussing a specific ban on sex offenders from using public libraries); *Surita v. Hyde*, 665 F.3d 860, 871 (7th Cir. 2011) (discussing constitutionality of a directive targeting an individual); *Brown v. City of Jacksonville*, 2006 U.S. Dist. LEXIS 8162, at *4-*5 (M.D. Fla. Feb. 17, 2006) (discussing a ban from city council meetings and on the rule authorizing bans "as applied").[23] Plaintiffs' claim is distinguishable because, as noted above, Plaintiffs do not challenge their own ban, but the authority

---

[23] Some of the cases cited by Plaintiffs also involved traditional public forums, further distinguishing them from this case, where Plaintiffs have failed to establish that the traditional public forum analysis applies. *See, e.g., Yeakle*, 322 F. Supp. 2d at 1127; *Sanchez v. City of Austin*, 2012 U.S. Dist. LEXIS 190686, at *9-*12 (W.D. Tex. Sept. 27, 2012).

of the Capitol Police altogether to remove individuals from the Statehouse. In short, nothing cited by Plaintiffs suggests they will be successful in their claim that a regulation that generally authorizes police powers is facially unconstitutional.

Further, Plaintiffs' arguments about due process similarly fail. That certain processes may be due in specific cases does not establish that K.A.R. § 1-49-9 is facially unconstitutional in all cases simply because it does not also contain detailed due-process requirements. Certainly, in specific instances, certain process might be due. But Plaintiffs are not challenging certain instances. *Folkers v. City of Waterloo*, 582 F. Supp. 2d 1141, 1153 (N.D. Iowa 2008) ("There is no 'one size fits all' formula for what process is due in all circumstances."). Accordingly, Plaintiffs have failed to establish their likelihood of success on the merits as to Count III.

### 3. Plaintiffs have failed to carry their heightened burden on the remaining injunction factors.

#### a. Count I

Plaintiffs dedicate all their briefing to arguing their likelihood of success on the merits, save for half a page dedicated to the remaining injunction factors. For the remaining injunction factors, they simply conclusively state that the other factors weigh in their favor and an injunction will not harm Defendants. Doc. 3 at 28.[24] The Court disagrees and finds that Plaintiffs have fallen short of carrying their burden for a preliminary injunction.

Plaintiffs' harm analysis is limited to the statement that it is "well-established that the suppression of speech, even for short periods, constitutes irreparable injury." Doc. 3 at 28. The Court acknowledges that "there is a presumption of irreparable harm for the loss of First Amendment freedoms." *Celebrity*, 660 F. App'x at 603. But, given that Plaintiffs have not

---

[24] Neither Plaintiffs' reply nor their supplemental brief addresses the remaining factors. *See* Docs. 20 and 30-1.

established a likelihood of success on the merits of their First Amendment claim, the presumption of injury does not apply. In other words, there is no presumption of irreparable harm for the loss of First Amendment freedoms where Plaintiffs have not shown a First Amendment violation.

Without a more fulsome harm analysis, the Court must guess at what potential irreparable harm Plaintiffs believe they will incur. To the extent they believe they will suffer harm in not being able to engage in their desired small-group or individual protests, that claim is overstated. In particular, Frank Burnham, the director of OFPM—the official in charge of event approval on the lower levels of the Statehouse—testified that his office does not require a permit application for a spontaneous gathering of people on the ground, 1st, and 2nd floors unless they specifically need reserved space or have other logistical needs like a podium, chairs, or an easel. Tr. at 230:9-231:7; Tr. at 243:20-244:9. Day likewise indicated that small groups of protesters would likely be allowed on the upper floors controlled by LAS without prior approval. Tr. at 120:7-16.[25]

Nor have Plaintiffs presented any evidence that officials have stopped small groups or individuals from entering the Statehouse without prior approval—or any evidence that such conduct would be consider an "event" under the permitting policy.[26] The Court acknowledges that K.A.R. § 1-49-10 does state that "[n]o person shall conduct any meeting, demonstration or solicitation . . . without the prior permission" of the Secretary of Administration. On its face, this

---

[25] As explained above, the only areas of the Statehouse Plaintiffs wish to protest in is the rotunda. There was no evidence suggesting a desire to protest outside the Statehouse, or in areas other than the rotunda.

[26] Plaintiffs' amended complaint and preliminary-injunction motion both discuss the incident in June 2018 where the Capitol Police briefly barred a group of protesters—not including any of the named Plaintiffs—from entering the Statehouse based on "unlawful assembly." Doc. 3 at 6. Tom Day's report on this incident actually stated that the individuals involved had a permit to protest on the south steps of the Statehouse but tried to move the demonstration into the building, when security barred entry for lack of a permit. Doc. 12-2 at 2. Security locked the doors after about "a dozen people disobeyed law enforcement officers by entering the doors and entering the foyer entrance leading to the security stations." Id. Plaintiffs also allege that in the confusion of this incident, an individual who had a planned meeting with his legislator was turned away from entry. Doc. 3 at 6. But that isolated incident does not suggest that officials routinely block individuals or small groups from entering the building just because they do not have prior approval.

regulation arguably requires even just one person to seek prior permission before holding a "demonstration." But the usage policy, which outlines the requirements for holding an "event" in the Statehouse, seems to more clearly relate to large or space-specific conduct. In particular, the event-request form for OFPM requires a requesting party to designate a specific space. Doc. 14-3 at 1-2. It asks about equipment required, such as tables, chairs, or a PA system. *Id.* It contemplates itineraries and presenters. *Id.* In sum, it simply seems to relate to "events" that are very different than the type of small and spontaneous citizen protests in the rotunda that Plaintiffs indicate they wish to engage in.

Finally, even if it did apply, both Day and Burnham also testified at the hearing that neither of them was aware of any permit application being denied based on viewpoint. Tr. at 131:7-24 (noting that the request is approved unless there is something wrong with it, and although it depends on the "nature of the request" and is "first-come-first-serve," "most requests are approved" and that there is no class of speaker prohibited from using the space controlled by LAS); Tr. at 207:11-18 ("To my knowledge, in my two years, we have not denied an application.").[27] The Court understands that Plaintiffs wish to demonstrate <u>without</u> prior approval. But under the current record, the Court does not find that Plaintiffs have shown that the policies they are challenging even apply to them, let alone that they are unconstitutional. On those facts, Plaintiffs have not shown a threat of irreparable harm.

The Court next compares the lack of irreparable harm to Plaintiffs to the harm to the state if it were to grant the injunction. Burnham further testified that the reason for the permitting rules for events in the Statehouse is to offer some degree of control over what is happening in the

---

[27] Burnham did add the caveat that he once denied a request by the Kansas Department of Transportation to land a helicopter on the Statehouse lawn, and then bring it into the rotunda. But that is obviously unlike any event Plaintiffs are suggesting, and OFPM denied it for "practical" reasons, not because of any particular viewpoint. Tr. at 242:3-9.

Statehouse "from a security standpoint; that it's just not a free-for-all where everybody can just come in and block the exits and do po-up whatever." Tr. at 219:14-220:22. Likewise, Day testified that the prior-approval rules give officials an idea of the logistical demands of the event so that officials can arrange for appropriate security, housekeeping, or technological needs. Tr. 125:19-126:13. These concerns are not unimportant. Removing any event policies would certainly effectively open the Statehouse doors to any and all activities—helicopters even. And balanced against the minimal harm Plaintiffs have shown, this balancing weighs against issuing an injunction.

### b.      Count III

Plaintiffs' claim in Count III challenges the authority of Capitol Police to issue complete premises bans. As explained above, Plaintiffs' analysis on the remaining injunction factors suffers from the same infirmities discussed above in Count I. Plaintiffs have not carried their burden.

Additionally, Plaintiffs seek a preliminary injunction enjoining Defendants from "[i]ssuing any complete premises bans pursuant to K.A.R. 1-49-9 that are exclusively for violations of the Statehouse usage policy." Doc. 3 at 29 (emphasis added). However, the Court notes that Hatcher, who oversees the officers at the Statehouse, Tr. at 250:2-4, testified that he instructs the officers under his command to only issue premises bans for actual violations of the law, that an arrest precede any trespass warning, and that the main consideration is whether the person poses a safety risk. Tr. at 260:11-22; 266:4-13 (explaining that Hatcher told Whitsell "that [Plaintiffs' conduct on March 27] is not something that we should be banning people for"). Hatcher specifically testified that

> my officer did not follow the policy that I wanted for to be
> followed. I wanted someone to create some type of crime,
> whether it's theft, whether it's stalking, threat, something of
> that nature. And those are the reason that I want people to be

36

> banned from the Statehouse. Not for things that are not
> criminal in nature.

Tr. at 283:21-284:4. Although he stated this was his "personal philosophy," he made it clear that he oversees Capitol Police and that is the standard that currently applies to imposing premises bans, which is why he reversed the ban Whitsell issued to Plaintiffs. Tr. at 284:6-24 (noting that Hatcher has the authority to unilaterally lift bans).

Given this, and given Plaintiffs' desire for an injunction only against bans for violations of the usage policy, the Court cannot find that Plaintiffs face any immediate or irreparable harm. *See McDonnell*, 878 F.3d at 1252. It is already the stated policy of the Capitol Police to not issue bans for conduct short of criminal violations—the precise relief Plaintiffs seek. Accordingly, they are in no danger of being banned for simple policy violations, and thus face no threat of immediate or irreparable harm.

### 4. Plaintiffs have not met their burden for issuance of a preliminary injunction.

Accordingly, the Court denies the Plaintiffs' motion for a preliminary injunction as to their surviving claims. Plaintiffs have failed to convince the Court of their likelihood of success on the merits of either surviving claim and have not established a threat of irreparable harm. Thus, Plaintiffs have not demonstrated that they are entitled to the "extraordinary remedy" of a preliminary injunction. *See id.*

## III. CONCLUSION

THE COURT THEREFORE ORDERS that Defendants' motion to dismiss (Doc. 22) is GRANTED IN PART AND DENIED IN PART. Specifically, the Court dismisses Counts II and IV of Plaintiffs' amended complaint. Counts I and III remain at issue.

THE COURT FURTHER ORDERS that Plaintiffs' motion for a preliminary injunction (Doc. 3) is DENIED.

THE COURT FURTHER ORDERS that the parties' motions for leave to file supplemental briefs (Docs. 29 and 30) are GRANTED.

IT IS SO ORDERED.

Dated: August 30, 2019                    /s/  *Holly L. Teeter*
                                          HOLLY L. TEETER
                                          UNITED STATES DISTRICT JUDGE